UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RUBEN CARNERO<br><br>Plaintiff,<br><br>- v. -<br><br>BOSTON SCIENTIFIC CORPORATION<br><br>Defendant. | Civil Action No. 04-cv-10031-RWZ |

**DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT OR STAY AND LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION AND REQUEST FOR ORAL ARGUMENT**

Defendant Boston Scientific Corporation ("BSC") hereby moves to dismiss or, in the alternative, for summary judgment or to stay Plaintiff Ruben Carnero's ("Carnero") complaint. In support of its motion, it has filed herewith a Memorandum in Support of its Motion to Dismiss or, in the alternative, Motion for Summary Judgment or Stay.

Pursuant to Local Rule 56.1, BSC submits a Statement of Undisputed Material Facts in support of its Motion for Summary Judgment. Pursuant to Local Rule 56.1, the following documentation is submitted in support of the Motion: (1) the Affidavit of Juan Pedro Ziemke; (2) the Affidavit of Carlos Dodds; (3) the Supplemental Affidavit of Carlos Dodds; and (4) the Affidavit of Leslie Blickenstaff, Esq. and the pleadings and exhibits attached thereto, including the Affidavit of Ruben Carnero.

**Parties**

1. Defendant Boston Scientific Corporation ("BSC") is a Delaware corporation with its principal place of business in Natick, Massachusetts. BSC is a party in three related actions: (a) the present case; (b) a related action that was filed with this Court on August 8, 2003 (the

"Massachusetts Action"); and (3) a related action in Argentina filed in the spring of 2003 (the "Argentinean Action").

2. Boston Scientific Argentina S.A. ("BSA") is a subsidiary of BSC. It is an Argentinean corporation with its principal place of business in Buenos Aires, Argentina. BSA is a party in the Argentinean Action.

3. Plaintiff Ruben Carnero is a citizen of Argentina and is listed on Argentina's national registry as being domiciled in Buenos Aires. Carnero is a party in this case, the Massachusetts Action and the Argentinean Action.

### Carnero's Employment With BSA

4. On January 31, 1997, BSA tendered Carnero a written offer of a position of employment in Argentina (the "BSA Offer Letter"). Ziemke Aff. ¶ 3, Ex. A. The BSA Offer Letter provides that Carnero's vacations, holidays and benefits would be provided pursuant to Argentine law.

5. Shortly thereafter, Carnero entered into an employment agreement with BSA (the "BSA Agreement"). Ziemke Aff. ¶ 4, Ex. B. The BSA Agreement supercedes all former agreements between Carnero and BSA. The BSA Agreement provides that BSA may terminate Carnero's employment "according to and under the circumstances set forth by Argentine labor regulations." The BSA Agreement was entered into in Argentina and provides that it will be governed by Argentine law.

6. Between February 1, 1997 and late 2000, Carnero rendered services for BSA pursuant to the BSA Agreement. Initially, Carnero was employed as the Country Manager for Argentina. In 1999, Carnero was assigned to the position of Latin America Business

Development Director. In that position, he continued to be employed and compensated by BSA and his principal office continued to be in Buenos Aires. Ziemke Aff. ¶ 5.

7.   In late 2000, an assignment as country manager in Boston Scientific's Brazilian operations at Boston Scientific Do Brasil Ltda. ("BSB") became available. On June 25, 2001, Carnero received a letter that offered him an assignment as Country Manager for BSB (the "BSB Offer Letter"). Ziemke Aff. ¶ 6, Ex. C. That same day he received a document setting forth the specific terms and conditions that would govern the Brazilian assignment (the "BSB Assignment Memorandum"). Ziemke Aff. ¶ 7, Ex. D. Neither the BSB Offer Letter nor the BSB Assignment Memorandum purports to supercede the BSA Agreement. Ziemke Aff. ¶ 9.

8.   On June 26, 2001, Carnero signed an agreement with BSB entitled "Contrato de Trabalho". Ziemke Aff. ¶ 8, Ex. E. This agreement, written in Portuguese, provides that it will be interpreted according to the laws of Brazil. Carnero's employment relationship with BSA was then suspended, but not terminated, so that he could continue to be an employee of BSA during the period that he was assigned to perform services for BSB. Ziemke Aff. ¶ 9. Thereafter, from around July 2001 to August 8, 2002, Carnero performed services for BSB under the terms of the BSB Assignment Memorandum. Ziemke Aff. ¶ 9.

9.   On August 8, 2002, BSB terminated Carnero's assignment in Brazil.

10.  Carnero has admitted that he understood that his August 8, 2002 termination was a termination from all three entities, meaning that Carnero would "no longer be working for any part of the BSC organization." See Affidavit of Leslie Blickenstaff ("Blickenstaff Aff."), ¶ 5 (Carnero's Opposition to BSC's Motion to Dismiss or Stay in the Massachusetts Action, p.12). Carnero asserts that "it was clear to [him] that BSC intended to terminate [him] not only from [his] current assignment as BSC's Country Manager for Brazil but from any position for BSC in

- 3 -

LIBD/1229854.1

any other capacity." *Id.* ("Mr. McFaul made it clear that BSC intended to terminate me from any job capacity for BSC. . . ."); *Id.* (asserting that the August 9, 2002 memorandum "clearly states that my 'future pursuits' would no longer be within the BSC organization."). Carnero believed he had been terminated from BSB, BSA and BSC because he sought severance indemnities from BSA and BSB. *Id.* (explaining that between August 2002 and March 2003 he engaged in settlement negotiations with BSC regarding his rights to statutory termination benefits under Brazilian and Argentine law). Finally, Carnero has asserted that all of BSA and BSC's actions after August 8, 2002, constituted maneuvering to avoid the obligation to pay statutory severance indemnities. *Id.*

11.    Upon terminating Carnero's assignment, BSB paid Carnero the sums it owed him pursuant to Brazilian labor laws and the "Contrato de Trabalho". Ziemke Aff. ¶ 10. However, Carnero believed that he should receive additional sums of money from other BSC entities and thus attempted to negotiate for them. These negotiations, which lasted from August 2002 to March 2003, did not result in an agreement. Ziemke Aff. ¶ 11.

12.    After the negotiations failed, Carnero and BSA exchanged various telegrams regarding his employment at BSA:

(a)    On March 19, 2003, Carnero sent a telegram[1] to BSA stating:

Having failed to respond to my claims I hereby request you to pay within a 48 hours term, severance indemnities according to Argentina Labor Law and emergency legislation according to my position and salary. Otherwise I will consider myself terminated without just cause.

Ziemke Aff. ¶ 12(a), Ex. F.

---

[1] For the convenience of the Court, all of the telegrams referenced herein have been translated from Spanish to English by an Argentinean attorney.

- 4 -

LIBB/1229854.1

first notice BSA had received from Camero regarding his desire to return from his BSB assignment to work at BSA. The telegram was sent from Florianopolis, Brazil and did not state a precise domicile for Camero.

(c) On March 25, 2003, BSA responded to Camero's March 21st telegram as follows:

> Dear Mr. Camero, We hereby acknowledge receipt (on 3/21/03) of your international telegram dated on 3/19/03. In this regard, we inform you that considering your will to restore the employment relationship that was suspended by your own decision, collecting no payment whatsoever 4/1/03, this Company shall re-incorporate you on (unpaid leave), Since the position of Business Development Director that you held through June 2001 has been eliminated due to the economic crisis suffered by the country, the company shall provide you with a position of similar hierarchy and preserving your monthly salary of $15,000 (Fifteen Thousand Argentine Pesos), identical income as the one you have received through the date you decided to suspend the labor relationship.

Ziemke Aff. ¶ 12(c), Ex. G.

Because Camero's original telegram did not identify Camero's domicile, BSA sent this telegram to the post office from which it was delivered.

(d) On March 26, 2003, Camero (who had not waited for a response from BSA), sent BSA another telegram, stating "Due to your silence I consider myself terminated without just cause". Ziemke Aff. ¶ 12(d), Ex. H.

(e) BSA responded as follows:

> Dear Mr. Camero, We hereby acknowledge receipt (on 3/26/03) of your international telegram dated 3/25/03 whereby you consider yourself dismissed. We hereby repeat our telegram dated 3/25/03 whereby we resume as of 4/2/03 the employment relationship which was suspended

– 5 –

- 6 -

by your own decision, preserving a similar job position to the one you held early before the suspension and receiving a monthly salary of $15,000 (Fifteen Thousand Argentine Pesos), identical salary you used to receive at the time you decided to suspend the labor relationship. We terminantly reject your alleged silence on our part. We demand you modify your breaching position. In any event, in case you turn down our offer we shall consider that the relationship has been terminated by your exclusive fault.

Ziemke Aff. ¶ 12(e), Ex. I.

BSA thereby gave Carnero the opportunity to retract his resignation. However, Carnero did not respond.

(f)   Because Carnero did not respond to BSA, on April 3, 2003 it sent him another telegram, which read as follows:

Mr. Carnero: April 2, 2003 has passed and you have not reinstated the employment relationship with this Company, which was suspended by your own request. Evidently, you have never had the intention of reinstating the employment relationship with this Company. This is not only proved by the content of your letters, in which you always made clear your will of termination, but also by the fact that you sent your letters from Brazil and not from Buenos Aires, where you could be accessible to the Company. Likewise, you never let the Company know your domicile in Brazil so as to be able to contact you. Your concealment and obstructions are evidenced by the telegrams you sent from Brazil, without stating any domicile whatsoever. Obviously, your malicious conduct made it impossible for us to maintain an exchange of letters with you. It is worth noticing that your concealment has also been demonstrated by the fact that your letters were sent from different places within Brazil (explicitly) from San Pablo and Florianopolis). Therefore, we hereby assert the termination of the employment relationship by your own fault and responsibility.

Ziemke Aff. ¶ 12(f), Ex. I.

(g)   On April 5, 2003, Mr. Carnero responded:

I hereby reject telegram 140/132 12 1325 since it is untimely and telegram 175/175 03 1705 for being false and relationship terminated for your fault. I reject reception of telegram 25/3/03 however untimely. In light of acknowledgment of change of economic condition in any event I considered again offended and ratify dismissal for your fault. I reserve rights and actions.

Ziemke Aff. ¶ 12(g), Ex. K.

(h) On April 9, 2003, BSA responded as follows:

Mr. Carnero, We acknowledge receipt of your telegram dated April 5, 2003. We firmly deny it for being false, malicious and irrelevant. All our responses to your correspondence were sent in due course. Our Company has not changed the economic term as you highlight; quite the opposite, the Company fully confirmed the economic terms, which were in effect before you voluntarily, suspended the employment relationship. We hereby totally repeat our telegram dated April 3, 2003. The employment agreement has been terminated due to your exclusive fault. You never had any willingness to resume the employment relationship, fact that is still evidenced, among other circumstances, as you continue sending your correspondence from abroad. We hereby interrupt the exchange of correspondence.

Ziemke Aff. ¶ 12(h), Ex. L.

**The Argentinean Action**

13.  In early April 2003, Carnero filed a request for mediation in Argentina against BSA. With only a few exceptions, Argentinean law requires a plaintiff in a labor dispute to file a request for mediation and complete the mediation process before filing a lawsuit with an Argentinean court. This mediation process must be filed and completed prior to filing any lawsuit deriving from a labor relationship. Dodds Aff., ¶5. In his request for mediation, Carnero sought "outstanding salaries, seniority, payment in lieu of prior termination notice, whole month base salary pay, overtime compensation, accrued thirteenth salary, accrued vacations, damages,

- 7 -

moral damages, moving expenses, air tickets, travel expenses, stock option rights, application of Law 25,561 and its amendments, application of Law 25,323." Dodds Aff. ¶ 6, Ex. A.[2]

14. On April 28, 2003, Camero, BSA and BSC participated in a mediation session with mediator Daniel Braga Rosado. Dodds Aff. ¶ 9. During that session Camero extended his claims to BSC.

15. On June 12, 2003, BSA, BSC, and Camero participated in a mediation settlement hearing in Buenos Aires. Dodds Aff. ¶ 11. At that session, BSA and BSC presented counterclaims against Camero to restrain him from asserting that BSC and BSA had engaged in unlawful accounting practices and to force him to accept the labor certificates. During that session, the Argentinean mediator concluded that BSA, BSC and Camero could not reach a settlement regarding their claims and closed the mediation proceedings. The mediator also indicated that BSA offered to submit certain labor certificates[3] to Camero but that Camero had refused them. BSA thereafter informed Camero that it intended to file a request for consignment of the labor certificates. BSA and BSC also informed Camero that they intended to file an action against him for defamation. Dodds Aff. ¶ 11, Ex. B.

16. In the spring of 2003, BSC and BSA filed the Argentinean Action with the Argentinean Labor Court. Dodds Aff. ¶ 12, Ex. C. In that Action, BSC and BSA set forth the events leading up to Camero's voluntary resignation from employment with BSA and alleged that Camero had baselessly accused BSA and BSC of accounting irregularities, damaging BSA's and BSC's reputations. BSC and BSA also asked the Argentinean court to accept judicial

---

[2] For the convenience of the Court, a portion of the mediator's summary of the mediation has been translated from Spanish to English by an Argentinean attorney.

[3] Argentinean Labor Law requires that these labor certificates be provided to employees who are terminated for any reason whatsoever. Dodds Aff. ¶ 8.

- 8 -

deposit of the labor certificates that Camero had refused. Dodds Aff. ¶ 12. BSC and BSA sought damages in the amount of $30,000 Argentinean pesos. On August 14, 2002, on its second attempt, the Argentine court successfully served Camero with the Argentinean Complaint. Dodds Aff. ¶ 13, Ex. D.

17.  According to Argentine statutory law and case law, Argentine law must govern Mr. Camero's claims. Section 3 of the Argentine Employment Contract Law states:

> This law shall govern all matters or issues involving the validity of, and the rights and duties of the parties to an employment agreement executed within the Argentine territory or in a foreign country, provided it is performed in the Argentine Republic.

Dodds Supplemental Aff. ¶ 16-17. Argentine courts have unanimously held that Section 3 applies if the services under an employment relationship were rendered in Argentina, even when the place of execution of the agreement and the place of performance differ. *Id.* The fact that Camero rendered occasional services outside of Argentina does not alter the mandatory application of Argentine law. *Id.* In fact, Argentine courts have consistently held that Argentine law applies if services are rendered in Argentina-- even if the employee received instructions from officers residing in a different country. *Id.*

18.  Argentine courts have jealously guarded their exclusive jurisdiction to resolve disputes under an employment agreement that is performed in Argentina. *Id.* at 18. This is consistent with Argentina's public policy, which provides a remedy to employees who are discharged without cause whereas many other countries, including the United States, generally do not. *Id.* More specifically, an employee in Argentina who is terminated without cause is statutorily entitled to severance indemnities because Argentina considers a termination without cause to be an unjustified breach of the employment contract that runs contrary to public policy—whether or not the employee has a written contract of employment. *Id.* The severance

- 6 -

LIBB/1229854.1

indemnities are intended to remedy the employee's economic and moral damage, but also to deter employers from terminating employees without cause. *Id.*

19.  On September 2, 2003, Camero filed an answer to the Argentinean Complaint (the "Argentinean Answer"). Dodds Aff. ¶ 15, Ex. F. In that Answer, Camero claims, among other things, that (a) he was employed by BSC, not exclusively by BSA; (2) that BSC controls BSA and its other subsidiaries and is therefore liable for BSA's actions; (3) that he did not defame BSC and BSA by reporting accounting irregularities; and (4) that this Court is the more appropriate forum for the parties' litigation. Dodds Aff. ¶ 15.

**The Massachusetts Action**

20.  After commencing mediation in Argentina and after BSC and BSA filed the Argentinean Action, Camero filed the Massachusetts Action on August 7, 2003 and served BSC on August 25, 2003.

21.  In the Massachusetts Action, Camero raised claims that arise out of the same transactions or occurrences on which the Argentinean Action is based.

22.  On September 15, 2003, BSC filed a Motion to Dismiss or Stay the Massachusetts Action pending the outcome of the Argentinean Action. Blickenstaff Aff. ¶ 2. The parties thoroughly briefed the relevant legal and factual issues and engaged in oral argument on January 7, 2004. This Court's decision with respect to that motion is pending.

**The DOL Complaint**

23.  On July 2, 2003, Camero filed a complaint against BSC with the Department of Labor ("DOL") alleging that BSC violated Section 806 of the Sarbanes-Oxley Act ("SOX") when it terminated his employment. Blickenstaff Aff. ¶ 6. Camero's complaint asserts that he "reasonably believed" BSC's "conduct . . . constitutes a violation of the provisions of Title 18 of

- 10 -

the United States Code, rules or regulations of the Securities Exchange Commission and other US federal law relating to fraud against shareholders." *Id.*

24.     BSC was not served with Carnero's DOL complaint or asked to respond to his allegations. Shortly after he filed Carnero's complaint with the DOL, Mr. Carnero's counsel was made aware that the DOL questioned its jurisdiction. Mr. Carnero's counsel submitted a statement to the DOL on July 7, 2003 regarding the jurisdictional issue. The DOL did not notify BSC of Mr. Carnero's claim nor did it ask BSC to state a position regarding the DOL's jurisdiction. Based on statements made by Mr. Carnero's counsel and by DOL representatives, it is BSC's understanding that the extraterritoriality issue was referred by the DOL's Regional Office to the Secretary of Labor and to the Solicitor's Office before the DOL issued its preliminary ruling on December 19, 2003 that:

> nothing in the language of [Section 806] indicates that Congress intended the anti-retaliation provision in Title VIII to extend to employees of covered companies or their contractors or subcontractors during their employment outside the United States. [The DOL], therefore, does not have jurisdiction to investigation [Carnero's] allegation of retaliatory discharge under [Section 806].

*See* Blickenstaff Aff. ¶ 7.

The DOL supplied a copy of this ruling to the Securities and Exchange Commission.

25.     On January 7, 2003, Carnero filed his DOL complaint with this Court seeking de novo review of the DOL's ruling. In a cover letter to the Court, he asserted that a comment by Senator Leahy was evidence of Congressional intent to apply Section 806 extraterritorially. Specifically, Senator Leahy stated that SOX "was intentionally written to sweep broadly, protecting any employee of a publicly traded company who took such reasonable action to try to protect investors and the market." Blickenstaff Aff. ¶ 8.

- 11 -

26. On January 16, 2004, Camero filed a "Notice of Filing of Action for De Novo Review and, Alternatively, Notice of Objections To Preliminary Findings and Request For Hearing on the Record" ("Notice and Objections"). The Notice of Objections challenged the legal, but not the factual basis, for the DOL's preliminary finding that it does not have jurisdiction to investigate Camero's complaint. Blickenstaff Aff. ¶ 9.

27. On January 22, 2004, the Administrative Law Judge ("ALJ") dismissed Camero's DOL complaint based upon his filing of this action. During a teleconference with the ALJ on January 26, 2004, the ALJ indicated that the issue of whether the DOL has any further jurisdiction is an issue for the District Court to determine. Blickenstaff Aff. ¶ 10.

## REQUEST FOR ORAL ARGUMENT

BSC respectfully requests oral argument on the issues raised by its Motion to Dismiss, or in the alternative, its Motion for Summary Judgment or to Stay.

Respectfully submitted,

BOSTON SCIENTIFIC CORPORATION

By its attorneys,

/s/ James W. Nagle

James W. Nagle, P.C. (BBO # 366540)
Leslie S. Blickenstaff (BBO # 636267)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

January 27, 2004

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail(by hand) on 1/27/04.

/s/

- 12 -

LIBB/1229854.1