UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

RUBEN CARNERO

          Plaintiff,

     - v.-

BOSTON SCIENTIFIC CORPORATION

          Defendant.

Civil Action No. 04-cv-10031-RWZ

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT OR TO STAY**

James W. Nagle, P.C. (BBO # 366540)
Leslie S. Blickenstaff (BBO # 636267)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

## INTRODUCTION

Boston Scientific Corporation ("BSC") submits this memorandum in support of its motion to dismiss or, in the alternative, for summary judgment or to stay Ruben Carnero's Complaint (the "Motion"). BSC's Motion should be granted for the following reasons:

1.   Carnero's claim pursuant to Section 806 of the Sarbanes-Oxley Act ("SOX") must be dismissed because Section 806 does not apply extraterritorially to Carnero, who is an Argentine citizen who worked for an Argentine company in Argentina.

2.   Even if SOX applies extraterritorially, BSC is entitled to summary judgment because Carnero did not meet the 90-day deadline for filing a timely complaint with the Department of Labor. Since Carnero failed to meet this deadline, he is precluded from pursuing his claim.

3.   BSC is also entitled to summary judgment with respect to Carnero's Section 806 claim because Carnero failed to state the specific statutory or regulatory provision that he reasonably believed BSC violated and has failed to allege the requisite causation to support his claim.

4.   Alternatively, Carnero's Section 806 claim should be dismissed or stayed under the doctrines of international comity and forum nonconveniens.

## SUMMARY OF FACTS[1]

From 1997 to 2000, Ruben Carnero, a citizen of Argentina, was employed by Boston Scientific Argentina S.A. ("BSA"), a subsidiary of Defendant Boston Scientific Corporation ("BSC"). As an employee of BSA, Carnero performed the majority of his work in Latin America and the terms and conditions of his employment were governed by Argentine law. In late 2000, Carnero accepted an assignment as country manager with Boston Scientific Do Brasil Ltda. ("BSB"). Carnero's employment relationship with BSA was suspended, but not

---

[1]    A complete statement of the material undisputed facts which support the motion are set forth in the motion itself as required by L.R. 56.1.

- 2 -

terminated, so that he could continue to be an employee of BSA during the period that he was assigned to perform services for BSB.

On August 8, 2002, BSB terminated Carnero from his position in Brazil. Based upon the circumstances of his termination, Carnero claims that he understood that he was being terminated from his employment with all BSC-related entities. Upon terminating Carnero's assignment, BSB paid Carnero the sums it owed him pursuant to Brazilian labor laws. However, Carnero believed that he should receive additional sums of money for his termination from other BSC entities and, thus, attempted to negotiate for additional payments. These negotiations, which lasted from August 2002 to March 2003, did not result in an agreement. After the negotiations failed, Carnero and BSA exchanged various telegrams regarding his employment at BSA, which resulted in Carnero receiving formal notification from BSA that his employment had been terminated by BSA based upon his failure to accept an offer of employment with BSA by April 2, 2003. Three different lawsuits ensued:

1. Carnero, who claims he was terminated without cause from BSA, filed a request for mediation in Argentina against BSA and BSC, seeking statutory severance that would be due to him under Argentine law if BSA had terminated him without cause and claiming that BSC had terminated his employment in retaliation for his reporting of alleged accounting irregularities. Because the mediation was unsuccessful, BSA and BSC filed a lawsuit in Argentina (the "Argentinean Action") against Carnero to resolve the dispute regarding the termination of his employment and to restrain him from asserting that BSC and BSA had engaged in unlawful accounting practices.

2. Carnero filed a claim against BSC with this Court (the "Massachusetts Action"), claiming that BSC had terminated his employment in retaliation for his reporting of alleged accounting irregularities. On September 15, 2003, BSC filed a Motion to Dismiss or Stay the Massachusetts Action pending the outcome of the Argentinean Action. This Court's decision with respect to that motion is pending.

3. Carnero filed a claim with the Department of Labor ("DOL") against BSC alleging that BSC violated Section 806 of the Sarbanes-Oxley Act ("SOX") when it terminated his employment. On December 19, 2003, the DOL issued a

- 3 -

preliminary ruling that it did not have jurisdiction to investigate Carnero's allegation of retaliatory discharge because Section 806 did not apply extraterritorially to foreign nationals working overseas. Carnero now seeks a *de novo* review of the claim that he brought with the DOL.

## ARGUMENT

I. ## THE COMPLAINT MUST BE DISMISSED BECAUSE CARNERO HAS NO STANDING TO SUE UNDER SECTION 806 OF THE SARBANES-OXLEY ACT

A. *Unless Congress Expressed A Clear Intention To Apply Section 806 Extraterritorially, The Protections Of Section 806 May Not Be Extended To Foreign Nationals Working Overseas*

"It is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 248 (1991) (hereinafter "*Aramco*") quoting *Foley Bros. Inc. v. Filardo,* 336 U.S. 281, 285 (1949). This presumption against extraterritorial effect is based on the common sense notion that Congress is "primarily concerned with domestic conditions" when it legislates. *Foley Bros.,* 336 U.S. at 285 (1949). Because there is an assumption that Congress legislates with knowledge of the presumption against extraterritoriality, Congress must clearly express an affirmative intention to extend statutory coverage outside of the United States. *Aramco,* 499 U.S. at 248. In applying this rule, a court must determine whether language in the statute gives "any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control." *Foley Bros.,* 336 U.S. at 285. The burden is on the plaintiff to overcome the presumption against extraterritoriality. *Labor Union of Pico Korea, Ltd. v. Pico Products, Inc.,* 968 F.2d 191, 194 (2nd Cir. 1992) (citing *Aramco*).

The presumption against extraterritoriality "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord."

- 4 -

*Aramco*, 499 U.S. at 248. Accordingly, the requirement of a clear statement of Congressional intent is especially necessary when extraterritorial application of the statute in question would violate the laws of another nation. Indeed, "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. The Charming Betsy*, 6 U.S. 64, 118 (1804).

The Supreme Court has consistently declined to give extraterritorial effect to statutes that would reach and regulate the employment relationship of foreign nationals working outside of the United States. *See, e.g., Foley Bros.*, 336 U.S. at 286 (declining to apply the Eight Hour Law to work performed in foreign countries in part because "[a]n intention . . . to regulate labor conditions which are the primary concern of a foreign country should not be attributed to Congress in the absence of a clearly expressed purpose"); *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21 (1963) (declining to extend NLRA to foreign crew on foreign vessel in American waters in part because of the possibility of "international discord"); *Benz v. Compania Naviera Hidalgo*, 353 U.S. 138, 147 (1957) (declining to apply LMRA to foreign seamen on foreign vessel in United States waters because "[f]or us to run interference in such a delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed."). *See also Alino v. Aerovias de Mexico, SA*, 129 F. Supp.2d 1341, 1345 (S.D. Fla. 2000) (declining to extend the Aviation Investment and Reform Act to a discrimination claim brought by a US resident traveling on a foreign carrier operating a foreign domestic flight that does not travel to a place within the United States because, *inter alia*, "[j]ust as the United States would not expect its air carriers to have to comply with Mexican laws and regulations and to be subject to suit in Mexico for any violations of those laws, Mexico should

- 5 -

not expect its air carriers to have to comply with American laws and regulations when operating domestic flights wholly within Mexican borders.").

If Section 806 were found to apply to Carnero and his claims in this case, any DOL or judicial ruling would apply in Argentina to an Argentine citizen and Argentine company, thereby directly interfering with a domestic employment relationship. This would be especially controversial if a United States agency or court were to order that Carnero be reinstated, essentially ordering BSA, an Argentine company, to re-employ one of its former employees. Such a ruling would contravene Argentine employment law, which strongly favors Argentine jurisdiction over employment-related disputes and provides specific remedies and sanctions for the discharge of employees without cause. Statement of Undisputed Material Facts ("SUMF"), ¶ 17-18. Without evidence of a clearly expressed Congressional intent to do so, which Section 806 does not contain, this Court should not interpret Section 806 to apply in a way that creates the possibility for excessive interference with the labor relations of a foreign nation. *Foley Bros. v. Filardo,* 336 U.S. 281 (1949). *See also NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 500 (1979) (the rules articulated in *Benz* and *McCulloch* are intended to avoid statutory constructions that would raise serious questions of separation-of-powers and international comity that are associated with construing a statute to displace the domestic law of another nation).[2]

**B.**     ***Congress Did Not Clearly Express An Affirmative Intention To Extend The Protections Of Section 806 To Foreign Nationals Working Overseas***

Carnero cannot overcome the *Aramco* presumption because Congress did not clearly express any intent to apply Section 806 to non-U.S. citizens working overseas. Section 806

---

[2]     To the extent that Carnero argues that failing to extend the protections of Section 806 to foreign nationals is contrary to public policy because it would undermine SOX's underlying purpose of regulating United States markets, such an argument is better addressed to Congress, with whom the authority lies to state expressly that Section 806 should protect foreign citizens working outside the Unites States.

(codified as 18 U.S.C. 1514A), protects "any officer, employee, contractor, subcontractor or agent" of a company with registered securities from retaliation for whistleblowing. 18 U.S.C. 1514A ("Section 806"). Section 806 does not define the term "employee" to include foreign nationals. In fact, neither Section 806 nor any other provision of SOX contains any definition of "employee" nor any statement that Section 806 is intended to apply extraterritorially. The protection of "any employee" in Section 806 does not reflect the specific intention by Congress to cover foreign nationals working abroad that is needed to overcome the presumption against extraterritorial coverage. *See, e.g., Aramco* at 255-256 and n.* (Title VII's definition of employee as "an individual employed by an employer" does not mean that foreign citizens constitute employees). Indeed, had Congress intended Section 806 to extend to such employees, it would have done so explicitly. Congress has consistently demonstrated that it knows how to give extraterritorial scope to the coverage of a statute. *See, e.g.,* 29 U.S.C. § 630(f) (for purposes of the ADEA, employee includes "any individual who is a citizen of the United States employed by an employer in a workplace in a foreign country");[3] 42 U.S.C. § 2000e(f) (Title VII) and 42 U.S.C. § 12111(4) (ADA) (apply "[w]ith respect to employment in a foreign country . . . [to] an individual who is a citizen of the United States"); the Logan Act, 18 U.S.C. § 953 (applying Act to "[a]ny citizen . . . wherever he may be . . ."). Congress' failure to exercise its legislative authority to define the term "employee" in Section 806 to include extraterritorial coverage even for American citizens working in a foreign country precludes a finding that Carnero, an Argentine working in Argentina, is entitled to the protections of Section 806.[4]

---

[3] After several courts held that the ADEA did not apply overseas, Congress amended § 11(f) to specifically state that the term "'employee' includes any individual who is a citizen of the United States employed by an employer in a workplace in a foreign country."

[4] Neither the title of Section 806 ("Whistleblower Protection for Employees of Publicly Traded Companies") nor the fact that Section 806 prohibits publicly traded companies "and their agents" from discriminating against

LIBB/1226722.3

**C.    *When SOX Is Read As A Whole, It Is Apparent That Congress Chose Not To Extend The Protections Of Section 806 To Foreign Nationals Working Abroad***

The conclusion that Congress did not intend Section 806 to apply to foreign nationals working overseas emerges clearly when SOX is read as a whole. First, the statute expressly mandates that complaints under Section 806 be governed by the procedures established by the Aviation Investment and Reform Act ("AIR"). 18 U.S.C. § 1514A(b)(2)(A). The AIR has been held not to apply extraterritorially. *See Alino v. Aerovias de Mexico, SA,* 129 F. Supp.2d 1341, 1345 (S.D. Fla. 2000) (declining to extend AIR to a discrimination claim brought by a US resident traveling on a foreign carrier operating a foreign domestic flight that does not travel to a place within the United States). Since Congress is presumed to have knowledge of interpretations of existing laws when enacting new laws, it can be presumed that Congress knew that by making the AIR complaint procedures applicable to Section 806, it would follow that Section 806, like AIR, would not apply extraterritorially. *See, e.g., INS v. Phinpathya,* 464 U.S. 183, 200 (1984) ("Of course, when Congress enacts a new law that incorporates language of a pre-existing law, Congress may be presumed to have knowledge of prior judicial interpretations of the language and to have adopted that interpretation for purposes of the new law.").

Further, in Section 1107 of SOX, Congress elected to amend an existing statute that has explicit extraterritorial application by making it a criminal offense to retaliate against individuals who provide "a law enforcement officer any truthful information relating to a commission or a

---

whistleblowers demonstrates any clear Congressional intent to apply Section 806 extraterritorially. Any suggestion to the contrary requires the reader to infer intent in a manner that is contrary to the presumption against extraterritoriality and the requirement of a clear expression of Congressional intent to overcome that presumption. *See generally Aramco.*

possible commission of a Federal offense." 18 U.S.C. § 1513(e).[5]  That Congress took care to

give extraterritorial application to the criminal sanction in Section 1107 for retaliation against a

specific and narrow type of whistleblowing activity to law enforcement officers but did not do so

in Section 806 evidences an intention by Congress to apply the civil whistleblower protections

only to U.S. citizens working within the United States. *See Field v. Mans,* 516 U.S. 59, 67

(1995) ("an express statutory requirement here, contrasted with statutory silence there, shows an

intent to confine the requirement to a specified instance.").  This enactment reflects a sensible

policy compromise:  Congress struck a balance by electing on one hand to deter retaliation

globally against individuals who make truthful reports to law enforcement officers of Federal

offenses by imposing criminal sanctions directly on retaliators, yet, on the other hand, electing

not to intrude improperly on foreign nations' sovereign right to regulate their own civil

employment relationships by not extending Section 806 extraterritorially.

Finally, Congress failed to provide any mechanisms for overseas enforcement of Section

806 and failed to address the subject of conflicts with foreign laws and procedures.  Had

Congress intended Section 806 to apply to foreign nationals working abroad, it certainly would

have addressed these issues.  For example, when Congress amended the ADEA to apply to U.S.

citizens working abroad, it specifically addressed potential conflicts with foreign law by

providing that an employer could engage in practices that would normally violate the ADEA

"where such practices involve an employee in a workplace in a foreign country, and compliance

with [the ADEA] would cause such employer . . . to violate the laws of the country in which such

workplace is located."  29 U.S.C. § 623(f)(1).  Section 806 contains no such effort to harmonize

---

[5]  Section 1107 amended 18 U.S.C. § 1513, which addresses retaliation against a witness, victim or informant.  In 18 U.S.C. § 1513(d), Congress states "[t]here is extraterritorial Federal jurisdiction over an offense under this section."

- 9 -

its procedures with the countervailing policies, laws and procedures of foreign sovereigns. As a result, if Section 806 were deemed to apply to a foreign citizen employed abroad, it would likely conflict with foreign laws and policies, resulting in undesired international discord. *See supra* Part I(A) (discussing public policy reasons for declining to apply statutes extraterritorially).

**D.**    ***There Is No Clear And Unambiguous Legislative History To Fill The Gap Left By The Absence Of Specific Statutory Language To Extend Section 806 Extraterritorially***

Given the presumption against extraterritoriality and the absence of specific statutory language extending Section 806 to foreign citizens working abroad, Carnero faces a heavy burden to identify unambiguous and controlling legislative history to support his position. He completely fails to meet this burden.

In his January 7, 2003, letter to this Court, Carnero argues that Congressional intent to apply Section 806 extraterritorially can be implied from a comment by Senator Leahy that SOX "was intentionally written to sweep broadly, protecting any employee of a publicly traded company who took such reasonable action to try to protect investors and the market." SUMF, ¶25. This argument highlights the weakness of Carnero's position. Senator Leahy's statement makes no specific reference to extending Section 806 to foreign citizens working abroad. Indeed, his vague, general and isolated statement about the broad sweep of Section 806 cannot be tied to any specific statutory language extending SOX to foreign nationals and is therefore entitled to no weight in this Court's analysis. *See, e.g., Public Empl. Retirement Sys. of Ohio v. Betts*, 492 U.S. 158, 168 (1989) (legislative history that cannot be tied to the enactment of specific statutory language ordinarily carries little weight in judicial interpretation of the statute); *Chandler v. Roudebush*, 425 U.S. 840, 858 n. 36 (1976) (report of a joint conference committee of both Houses of Congress or the report of a Senate or a House committee, is accorded more

- 10 -

weight than the remarks even of the sponsor of a particular portion of a bill on the floor of the

chamber); *United States v. Int'l Union United Automobile Aircraft and Agricultural Implement*

*Workers of America,* 352 U.S. 567, 585-586 (1957) (same).

### E.     *The Agency Charged With Interpreting And Enforcing Section 806 Has Declined To Extend Section 806 Extraterritorially*

A reviewing court is obliged to accept the administrative interpretations of the agency

tasked by Congress with regulatory or adjudicative authority "if Congress has not previously

spoken to the point at issue and the agency's interpretation is reasonable." *United States v. Mead*

*Corp.,* 533 U.S. 218, 229 (2001) (citing *Chevron USA Inc. v. Natural Res. Def. Council,*

467 U.S. 837, 842-845 (1984)). By granting regulatory and adjudicative authority to an agency,

Congress "expect[s] the agency to be able to speak with the force of law when it addresses

ambiguity in the statute or fills a space in the enacted law, even one about which 'Congress did

not actually have an intent' as to a particular result." *Id.* (quoting *Chevron,* 467 U.S. at 845). In

this instance, the agency authorized (by 18 U.S.C. § 1514A(b) and (c)) to adjudicate cases under

Section 806 — the DOL — has declined to extend Section 806 extraterritorially to cover foreign

citizens working abroad.

When the DOL promulgated rules, it declined to extend Section 806 extraterritorially.

The DOL's regulations define employee as "an individual presently or formerly working for a

company or company representative, an individual applying to work for a company or company

representative, or an individual whose employment could be affected by a company or company

representative." 29 C.F.R. § 1980.101, "Procedures for the Handling of Discrimination

Complaints Under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002,

Title VIII of the Sarbanes-Oxley Act of 2002" (hereinafter the "DOL Regulations"). This

definition plainly does not specifically include foreign citizens. *See, e.g., Aramco,* 499 U.S.

at 255-256 and n.* (Title VII's definition of employee as "an individual employed by an employer" does not mean that foreign citizens constitute employees). Other provisions of the DOL Regulations, including its failure to provide for the potential conflict with foreign laws, are consistent with this conclusion. *See, e.g.*, 29 C.F.R. § 1980.113 (referring only to judicial enforcement "in the United States district court for the district in which the violation was found to have occurred," which would likely not extend to a violation involving a foreign citizen employee working overseas); *Id.* at § 1980.112 (referring only to appellate review in the circuit in which the violation allegedly occurred or in which the plaintiff resided, which again would not apply to a foreign citizen outside the United States); *Id.* at § 1980.103(c) (fact that plaintiffs can file Section 806 complaints "with the OSHA Area Director responsible for enforcement activities in the geographical area where the employee resides or was employed," indicates that, since OSHA offices are only within the United States, foreign citizens residing overseas are not covered).

Moreover, when directly presented with the issue of whether Section 806 applies extraterritorially in this case, the DOL explicitly invoked the presumption against extraterritoriality in *Foley Bros.* and concluded that "nothing in the language of [Section 806] indicates that Congress intended the anti-retaliation provision in Title VIII to extend to employees of covered companies or their contractors or subcontractors during their employment outside the United States." SUMF, ¶24.[6] Although the DOL's adjudicative finding on Carnero's

---

[6]    This result is consistent with the DOL's mission. The DOL

   fosters and promotes the welfare of the job seekers, wage earners, and retirees of the United States by improving their working conditions, advancing their opportunities for profitable employment, protecting their retirement and health care benefits, helping employers find workers, strengthening free collective bargaining, and tracking changes in employment, prices, and other national economic measurements.

- 12 -

claim is preliminary, it is apparent that this issue was referred to the Office of the Secretary of

Labor for a policy determination as the DOL did not even serve the complaint upon BSC after it

recognized that it presented a fundamental jurisdictional issue. The fact that the DOL sent a

copy of its preliminary finding to the Securities and Exchange Commission is a further indication

that the finding was intended to serve as a statement of formal agency policy on whether foreign

citizens working abroad can invoke the protections of Section 806. SUMF, ¶24. When

combined with the DOL's rules which did not elect to extend Section 806 extraterritorially, this

adjudicative finding effectively states the DOL's reasonable position on the issue of

extraterritorial scope and is entitled to appropriate deference.[7]

---

DOL Mission Statement, *available at* http://www.dol.gov/opa/aboutdol/mission.htm (emphasis added). As this statement demonstrates, the DOL is focused on U.S. employees and U.S. employment concerns. Applying Section 806 to non-U.S. employees would therefore be inconsistent with the DOL's mission. It would also add to the already significant burden on DOL resources and would present practical difficulties, such as differences in language and culture, labor laws, workplace practices and geographic distance. These differences would render it incredibly difficult to administer cases involving non-U.S. citizens.

[7]    To the extent that Carnero attempts to undercut the significance of the DOL's ruling because it is a preliminary finding, Carnero could join BSC in asking this Court to stay its decision on this matter and order the DOL to finalize its jurisdictional ruling. Such an action is contemplated by the commentary under the DOL's Regulations and relevant case law. *See* DOL's Regulations, Summary and Discussion of Regulatory Provisions, § 1980.113 (where a civil action has been filed and "a matter is pending before an administrative law judge or the Board for a decision, a Federal court also might treat a complaint as a petition for mandamus and order the [DOL] to issue a decision under appropriate time frames."). *Cf. Stone v. Duke Energy Corp.*, No. 3:03-CV-256 (W.D.N.C. June 10, 2003), available at www.oalj.dol.gov/public/wblower/refrnc/sox1list.htm (after the DOL failed to issue a final ruling within 180 days and the plaintiff filed a complaint with the district court, the court considered a writ of mandamus compelling the DOL to complete an administrative proceeding to be a possible remedy). Such an order would be appropriate in this case because the issue at hand—whether Section 806 applies extraterritorially to foreign nationals working overseas—is purely a question of law which would require no hearing or additional fact-finding. To the extent that this purely legal question will inevitably require adjudication by the First Circuit Court of Appeals or, indeed by the Supreme Court, it may ultimately be more efficient to allow the DOL to render a final decision that could be appealed directly by either party to the First Circuit which would then have the benefit of a final adjudicative ruling from the agency charged with enforcement to which it could extend appropriate deference under the principles articulated by *Mead* and *Chevron*. Carnero's apparent resistance to letting the DOL render a final decision reveals his underlying concern that the DOL has already concluded that it does not have jurisdiction over his claim.

- 13 -

## II.    BSC IS ENTITLED TO SUMMARY JUDGMENT BECAUSE CARNERO MISSED THE FILING DEADLINE

### A.    *Summary Judgment Standard*

Summary judgment "shall be rendered" when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Mass. R. Civ. P. 56(c). A party moving for summary judgment meets its burden by showing that there is an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). The burden then shifts to the party opposing the motion to "set forth specific facts showing that there is a genuine issue for trial." Mass. R. Civ. P. 56(e). Summary judgment is "particularly appropriate with regard to statute of limitations defenses." *Stone & Webster Engineering Corp. v. Duquesne Light Co.,* 79 F. Supp.2d 1, 6 (D. Mass. 2000) (quoting *Hays v. Mobil Oil Corp.,* 736 F. Supp. 387, 396 n.7 (D. Mass. 1990)).

### B.    *SOX Statute of Limitations*

Section 806 requires that a plaintiff file a complaint with the DOL within 90 days of the alleged retaliatory event. 18 U.S.C. § 1514A(b)(2)(D); *See also* 29 C.F.R. 1980.103 and 49 U.S.C. § 42121(b)(1) (AIR procedures applicable to Section 806 pursuant to Section 806(b)(2)(A)). A plaintiff must comply with this requirement in order to exhaust his administrative remedies. If he fails to do so, he will be precluded from filing a civil action. *See, e.g., Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385 (1982) (a timely charge with the EEOC is a requirement for bringing suit under Title VII that can only be overcome by showing waiver, estoppel, or equitable tolling). Under *Delaware State College v. Ricks,* 449 U.S. 250 (1980), and its progeny, this 90-day period begins when the alleged retaliatory decision has been made and communicated to the plaintiff. *See also* 29 C.F.R. § 1980.103 (applying *Ricks* rule to filings under Section 806).

- 14 -

### C.    *Carnero Claims He Was Terminated On August 8, 2002*

In Carnero's Opposition to BSC's Motion to Dismiss or Stay in the Massachusetts

Action, Carnero admits that he understood his August 8, 2002 termination to be a termination

from all three entities, meaning that Carnero would "no longer be working for any part of the

BSC organization." SUMF, ¶10 (citing to Carnero's Opposition, p.12). Indeed, Carnero asserts

that "it was clear to [him] that BSC intended to terminate [him] not only from [his] current

assignment as BSC's Country Manager for Brazil but from any position for BSC in any other

capacity." SUMF, ¶10 (citing to Carnero Aff. ¶ 25). *See also* SUMF ¶10 (citing to Carnero Aff.

¶27) ("Mr. McFaul made it clear that BSC intended to terminate me from any job capacity for

BSC . . . ."); SUMF ¶10 (citing to Carnero Aff. ¶ 26) (asserting that the August 9, 2002

memorandum "clearly states that my 'future pursuits' would no longer be within the BSC

organization."). Carnero's actions further demonstrate that he believed he had been terminated

from BSB, BSA and BSC because if he did not believe he had been fully terminated, he would

not have sought severance indemnities from BSA and BSB. *See* SUMF ¶10 (citing to Carnero

Aff. ¶¶ 29-30) (explaining that between August 2002 and March 2003 he engaged in settlement

negotiations with BSC regarding his rights to statutory termination benefits under Brazilian and

Argentine law).

Since Carnero plainly and unequivocally admits that he understood that he was fully

terminated from BSB, BSA and BSC on August 8, 2002, his understanding that an adverse and

retaliatory employment action had occurred triggered the statute of limitations, which required

him to file his DOL complaint within 90 days or by November 8, 2002. 18 U.S.C.

§ 1514A(b)(2)(D); *Ching v. Mitre Corp.*, 921 F.2d 11 (1st Cir. 1990) (holding that statute of

limitations began to run on the date that the plaintiff formed a belief that he was being terminated

and not on the later day when he received a formal notification of his termination). Carnero

missed this deadline by <u>eight months</u>. Accordingly, his DOL complaint is time-barred.[8]

**D.    *Even If Carnero Was Not Fully Terminated Until April 2003, He Missed The Filing Deadline***

As set forth above, on March 19, 2003, Carnero sent a telegram to BSA seeking

severance indemnities in accordance with Argentinean law or, in the alternative, reinstatement as

an active employee of BSA. SUMF, ¶12(a). This telegram was the first notice BSA had

received from Carnero regarding any possible desire to return from his BSB assignment to work

at BSA. SUMF, ¶12(b). On March 25, 2003, BSA responded to Carnero's telegram and offered

him a position similar to that which he had had prior to being assigned to BSB. SUMF, ¶12(c).

BSA informed him that the reinstatement would occur on April 1, 2003. SUMF, ¶12(c). On

March 26, 2003, Carnero informed BSA that he considered himself terminated. SUMF, ¶12(d).

("Due to your silence I consider myself terminated without just cause."). BSA responded by

reiterating its March 25, 2003 offer to reinstate him and gave him until April 2, 2003 to respond

to that offer. BSA stated that, "in case you turn down our offer we shall consider that the

relationship has been terminated by your exclusive fault." SUMF, ¶12(e). Carnero did not

respond on April 2, 2003. On April 3, 2003, BSA sent a ministerial letter confirming that

Carnero's failure to accept BSA's offer by April 2, 2003 had resulted in his termination. SUMF,

¶12(f).

---

[8]    Carnero asserts that all of BSA and BSC's actions after August 8, 2002 with respect to offering Carnero the opportunity to return to BSA were mere maneuvering to avoid the obligation to pay statutory severance indemnities and that he was actually terminated from all positions on August 8, 2002. SUMF, ¶10 (citing to Carnero Aff. ¶27-33). If Carnero's allegations are accepted as true solely for the purpose of this summary judgment motion, it is clear that he failed to act on a timely basis after he perceived that he was a victim of unlawful retaliation.

- 16 -

The foregoing facts demonstrate that if Carnero did not already understand that he was terminated from his position with all entities on August 8, 2002, then his employment with BSA ended on March 26, 2003—the day on which he informed BSA he "considered himself terminated." *See, e.g., Flaherty v. Metromail Corp.,* 235 F.3d 133, 138 (2nd Cir. 2000) (in constructive discharge case, the employee's claim accrues on the date the employee provides definite notice of her intention to resign). Accordingly, pursuant to 18 U.S.C. § 1514A(b)(2)(D), Carnero was required to file his complaint with the DOL within 90 days of March 26, 2003, or by June 24, 2003. Carnero's July 2, 2003 filing thus missed the filing deadline.

Carnero cannot establish that he was terminated later than April 2, 2003. BSA informed Carnero that he <u>had</u> to respond by April 2, 2003 or he would be terminated. SUMF, ¶12(e). Therefore, when Carnero elected not to respond on April 2, 2003, he knew that he had been terminated. At that point, the termination decision had been made and communicated to him, and thus the limitations period had commenced. *See Delaware State College v. Ricks,* 449 U.S. 250 (1980). Thus, even if it is assumed that Carnero's employment did not end until April 2, 2003 (the day by which he was required to respond to BSA in order to accept the proposed reinstatement), Carnero would have been required to file his DOL complaint by July 1, 2003, which he likewise failed to do. BSA's subsequent April 3rd telegram confirming his resignation was merely ministerial and did not extend the limitations period for an additional day. *See, e.g., Soignier v. Am. Bd. of Plastic Surgery,* 92 F.3d 547, 551-52 (7th Cir. 1996) (discovery of the original act of discrimination, not future confirmation of the injury or determination that the injury is unlawful, is when the statute of limitations begins to run); *Everett v. Cobb County School District,* 138 F.3d 1407, 1410 (11th Cir. 1998) (statute of limitations began when May 31,

- 17 -

1994 decision was made and communicated to plaintiff, not on June 6, 1994 when plaintiff received letter confirming May 31, 1994 decision).

**III.    BSC IS ENTITLED TO SUMMARY JUDGMENT BECAUSE CARNERO FAILED TO STATE A CLAIM UNDER SECTION 806**

**A.    *Carnero's Complaint Fails To State A Claim Under Section 806 With Any Specificity***

Carnero's complaint broadly and generally asserts that he "reasonably believed" BSC's "conduct . . . constitutes a violation of the provisions of Title 18 of the United States Code, rules or regulations of the Securities Exchange Commission and other U.S. federal law relating to fraud against shareholders." SUMF, ¶23. These baseless allegations fail to specify which conduct was unlawful, which statute BSC allegedly violated, and how BSC allegedly acted unlawfully. Carnero's failure to make more specific allegations is not merely a technical error. In fact, the accounting irregularities that he claims he reported were not material to BSC's financial reports, and his complaint offers no specific suggestion that BSC's shareholders were defrauded by the alleged irregularities. Carnero's non-specific allegations of garden-variety and immaterial accounting errors simply do not present the Court with the type of "hard facts" that would tempt it to stretch the governing legal principles to adjudicate claims that are more properly governed by Argentine law and adjudicated by the Argentine courts. Surely, SOX is not intended to extend protection to every employee who makes a report of a bookkeeping error without regard to the materiality of the error to investors.

**B.    *Carnero's Complaint Fails to Establish Causation***

Carnero's complaint also fails to establish the requisite causation necessary to prove a Section 806 claim. A Section 806 plaintiff must establish that his or her whistleblowing was a "contributing factor" to the employer's retaliatory action. 49 U.S.C. § 42121(b)(2)(B)(i). A

- 18 -

"contributing factor" is established only if the unfavorable action occurred "shortly after" the protected activity. 29 C.F.R. §1980.104(b)(2). Carnero claims that he began making reports of the irregularities in the summer of 2000 and yet he was not terminated until August 2002. As Carnero offers no other evidence of retaliatory motive, the extended two-year gap between his first report and his termination is far too long a period to establish any causal connection between the two events. Even if Carnero's last alleged report of irregularities (which was in no way more alarming or troubling than his first) is used as an alleged trigger for his discharge, that report occurred more than three months before his termination and is likewise too remote in time to create a causation inference. *See Clark Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing *Richmond v. ONEOK*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case [of retaliation] uniformly hold that the temporal proximity must be 'very close.'"); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four-month period insufficient)).

## IV. ALTERNATIVELY, THE COMPLAINT MUST BE DISMISSED OR STAYED UNDER THE DOCTRINES OF INTERNATIONAL COMITY AND FORUM NONCONVENIENS

On September 15, 2003, BSC filed a Motion to Dismiss or Stay in the Massachusetts Action. For the reasons set forth in that Motion (*see* SUMF, ¶22), the Court should dismiss this Complaint even if Carnero is deemed to state a viable claim under SOX that can survive BSC's Motions to Dismiss and for Summary Judgment because there is a parallel action in Argentina that raises the same factual allegations that are raised in this action, and because principles of judicial efficiency, the adequacy of judicial relief in Argentina, fairness to the parties and the fact

- 19 -

that the Argentinean case was first-filed all require a dismissal or stay of this case. That Argentina may not provide Carnero with all of the remedies he has in the United States is not dispositive. *See, e.g., Dragon Capital Partners L.P. v. Merrill Lynch Capital Svcs.,* 949 F. Supp. 1123, 1129 (S.D.N.Y. 1997).

## **CONCLUSION**

For the foregoing reasons, BSC urges the Court to dismiss, grant summary judgment or stay this action.

Respectfully submitted,

BOSTON SCIENTIFIC CORPORATION

By its attorneys,

James W. Nagle, P.C. (BBO # 366540)
Leslie S. Blickenstaff (BBO # 636267)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

Dated: January 27, 2004

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document
was served upon the attorney of record for each
other party by mail (by hand) on _____.

- 20 -