UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------------------------------------x

RUBEN CARNERO,                                    :

                                                  :        Civil Action: 03-11479 (RWZ)

                        Plaintiff,                :

                                                  :

            -against -                            :

                                                  :

BOSTON SCIENTIFIC CORPORATION,                    :

                                                  :

                        Defendant.                :

-----------------------------------------------------------------x

## MEMORANDUM IN OPPOSITION
## TO MOTION TO DISMISS OR, IN THE
## ALTERNATIVE, FOR SUMMARY JUDGMENT OR TO STAY

Plaintiff Ruben Carnero submits this memorandum in opposition to the

motion filed by defendant Boston Scientific Corporation ("BSC") to dismiss or, in

the alternatie, for summary judgment or to stay.

### *Preliminary Statement*

This is an action brought under the whistleblower provisions of the Sarbanes-

Oxley Act, legislation passed by Congress in July 2002 in the wake of

unprecedented corporate accounting scandals involving multinational corporations

such as Enron, Tyco, Qwest Communications and other public companies listed on

US securities exchanges.  The accounting scandals dramatically affected investor

confidence in US capital markets and it is undisputed that Congress enacted the

legislation in order to protect the integrity of those markets and to prevent

companies subject to US securities regulation from engaging in accounting fraud

and other corporate wrongdoing.

BSC moves to dismiss Mr. Carnero's suit on the ground that complaints of corporate fraud made by foreign citizens working outside of the United States do not fall within the Act's jurisdiction, even where, as here, those complaints are directed at a publicly traded US company.  BSC's narrow statutory interpretation is inconsistent with the Act's plain meaning as well as its undisputed purpose.  The Act broadly applies to any

> *person* who alleges discharge or other discrimination by
> any person in violation of [the Act].

18 U.S.C. §1514A(b)(1) (emphasis added).

Nothing in the language of the Act or its legislative history suggests that Congress intended to ignore corporate wrongdoing when it is reported by foreign citizens working outside of the United States.  On the contrary, the Act explicitly includes within its scope actions taken by "any officer, employee, contractor, subcontractor or agent" of a publicly traded company subject to the Securities and Exchange Act of 1934.  Congress was certainly aware that the largest publicly traded companies are, like BSC, engaged in extensive multinational operations.  Overseas operations of these companies account for a substantial portion of their revenue.  Accounting fraud and other corporate wrongdoing reported by individuals involved in the international operations of these corporations have just as direct an impact on the integrity of US capital markets as such conduct reported by individuals working within US borders.  BSC's narrow statutory interpretation would give free reign to multinational companies to suppress disclosure of corporate wrongdoing within their international organizations.

BSC is mistaken in its reliance on the presumption in *Foley Bros v. Filardo*, 336 U.S. 281 (1949), and similar cases that legislation *regulating labor conditions* is intended to apply domestically.  In *Foley*, the Supreme Court held that federal legislation regulating working conditions was not intended to apply outside the United States since neither the statute nor its legislative history reflected a Congressional intent to regulate foreign labor conditions.

That presumption has no application where the subject matter of the legislation has an international scope that directly affects US interests.  In this case, it is undisputed that the Congressional purpose underlying the Sarbanes-Oxley Act is to protect the integrity of US equity markets and provide safeguards to shareholders and other investors in publicly traded companies subject to the US securities laws.  *See*, *e.g.*, 149 Cong. Rec. S1725-01 (Attachment 32) (statement of Sen. Leahy).[1]  With respect to that purpose, it makes no difference whether a report of corporate wrongdoing comes from a person working within the United States or in another country.  In either case, the report furthers the Act's purpose of protecting the US equity markets and preventing the type of US corporate fraud and accounting violations that led to the enactment of the legislation.

BSC's alternative arguments for summary judgment based on the statute of limitations and failure to state a claim fail as a matter of law.  At the very least, they are premature prior to discovery pursuant to Fed. R. Civ. P. 56(f).

---

[1]Attachments are to the accompanying Griffith declaration.

3

## STATEMENT OF FACTS

The facts giving rise to this lawsuit are fully set forth in the Carnero's administrative complaint before the Department of Labor (Attachment 11) as well as the complaint in his related lawsuit asserting state law claims against BSC, *Carnero v. BSC*, 03-cv-11479-RWZ (the "State Law Action"). Copies of those complaints, which Carnero has verified (Carnero Dec. at ¶2), are annexed as Attachments 11 and 10, respectively to the accompanying declaration of plaintiff's counsel, Edward Griffith (the "Griffith Dec."). In addition, the facts are also described in the declarations of plaintiff, Ruben Carnero (the "Carnero Dec."), plaintiff's Argentine legal expert, Dr. Mario Ackerman (the "Ackerman Dec."), and plaintiff's counsel, Silvia Bolatti (the "Bolatti Dec.") submitted in opposition to BSC's pending motion to dismiss the State Law Action. Those declarations are annexed to the accompanying Griffith Declaration and are resubmitted in opposition to BSC's motion to dismiss this lawsuit.

For the convenience of the Court, the facts relevant to this motion are summarized below. In addition, a chronology of events based on the facts set forth in the accompanying declarations, is annexed as a demonstrative exhibit at Tab A.

### A.    *Carnero's Employment with BSC.*

Between January 1997 and August 2002, Carnero served in a variety of senior executive positions for BSC, including BSC's Latin American Business Development Director based in Mexico City, Country Manager for Argentina based in Buenos Aires and Country Manager for Brazil based in Sao Paulo. *See* Attachment 6 (State Law Complaint ("Compl.")) at ¶6.

4

### B.    *Carnero's Reports of Accounting Fraud.*

In mid 2000, Carnero became aware of false invoices and inflated sales figures in BSC's operations in Argentina.  Attachment 10 (Compl.) at ¶17.  He reported the problem to BSCs General Manager for Latin America, Juan Pedro Ziemke, who told Carnero that he would handle the problem.  *Id.* at ¶18. Shortly thereafter, Carnero was transferred to Brazil.  Carnero Dec. at ¶16.

In December 2000, Carnero continued to learn of false invoices and inflated sales in Argentina from other BSC employees, who he refered to Ziemke.  Attachment 10 (Compl.) at ¶18.  In March 2001, Carnero becomes aware of false invoices in Brazil.  *Id.* at ¶19.  As Country Manager for Brazil, he reverses the false sales of which he is aware and reports that the false sales problem has now spread from Argentina to Brazil.  *Id.*

When no action was taken in response to Carnero's reports, Carnero reported the false sales problem to BSC's senior manager for Corporate Analysis and Control, Arthur Gates, who agrees that there is mismanagement in the Latin American sales area.  *Id.* at ¶20.  Later that year, Carnero learns that other BSC employees have made false allegations accusing him of engaging in unethical conduct.  *Id.* at ¶21.  Although he requests an investigation into those false allegations, BSC took no action.  *Id.*

In 2002, Carnero continues to press for an investigation into the false sales problem and the false accusations against him.  In April, Ziemke confronts Carnero with a December 1999 letter purportedly signed by Carnero that appears to violate

BSC policy and raises ethical concerns. *Id*. at ¶22. Carnero had never seen the letter before and his signature is a forgery. *Id*. Carnero reports the incident to BSC headquarters and demands a meeting on the false sales problem and the increasing incidents apparently designed to discredit him. *Id*.

In May, 2002, Carnero meets with BSC's General Manger for Latin America, Canada and South Africa, David McFaul, to press for an investigation into the false sales problem, the attempts to discredit Carnero and the forged letter. *Id*. at ¶23. McFaul directs in-house counsel Ty Edmonson to investigate and report the results to Carnero. *Id*.

### C.    Carnero's August 8, 2002 Termination.

On August 8, 2002, Carnero was unexpectedly called to a meeting at a Sao Paolo hotel with David McFaul and three other BSC senior headquarters executives based in Natick Massachusetts. Carnero expected that he would be informed of the results of Ty Edmonson's investigation into his reports of accounting fraud. *Id*. at ¶24. Instead, McFaul and his colleagues told Carnero that he was being terminated "without cause" for differences in "management style." *Id*. Carnero was required to sign a letter acknowledging that he had been terminated from BSC's Brazilian subsidiary. Carnero Aff. at ¶¶23-25. He was told to vacate his office immediately. *Id*. at ¶25.

### D.    Carnero's April 3, 2004 Termination.

After the August 8, 2002 meeting, Carnero expected to receive written notification formally terminating him from BSC's Argentine subsidiary. Carnero

never received such notice, however, during the period in which he engaged in settlement discussions with BSC between his August 8, 2002 termination from BSC's Brazilian subsidiary and March 2003.  Carnero Dec. at ¶ 29.  When Carnero insisted on pressing his claims of accounting fraud and unethical conduct, however, BSC broke off the negotiations.  *Id.*  Carnero had still never received formal notice of the termination of his Argentine employment contract.  *Id.* at ¶ 30.  In order to force the issue, Carnero sent a telegram demanding either statutory termination benefits under Argentine law or job reinstatement.  *Id.* and Attachment 16.

In response, BSC's Argentine subsidiary offered to reinstate Carnero in a job, but at salary level determined by the Argentine peso rather than the U.S. dollar.  *See* Attachment 17.  The offer to fix Carnero's compensation by reference to the peso rather than the US dollar represented a pay cut of more than two thirds of his previous salary since the peso had experienced a dramatic devaluation over the two years Carnero had been working for BSC in Brazil.  Carnero Dec. at ¶ 31 n. 4.

When Carnero did not respond, on April 3, 2003, BSC sent Carnero a telegram stating:

> we hereby terminate the employment relationship by your exclusive fault and responsibility.

Attachment 18.

### E.    The Argentine Conciliation Proceeding and BSC's Defamation Suit.

By manufacturing a dispute over Carnero's compensation, BSC shifted the burden of proving that Carnero's termination was "without cause" to Carnero.

7

Ackerman Dec. at ¶¶20-21.  In order to meet that burden, Carnero was forced to commence a conciliation proceeding in Argentina.  *Id*. at ¶22; Carnero Dec. at ¶32.

Carnero then retained US counsel to pursue his claims arising from his reports of accounting fraud and unethical conduct.  On May 9, 2003, Carnero's US counsel sent a letter to BSC asserting a claim for retaliatory termination based on those reports and offering to engage in settlement negotiations.  Bolatti Dec. at ¶3.  Although Carnero's US counsel agreed to BSC's request for more time to investigate the charges, BSC used the additional time to prepare and file a defamation lawsuit in Argentina asserting that the allegations in the May 9, 2003 letter from Carnero's US counsel constituted defamation for which Carnero is liable.  *Id*. at ¶¶4-7.  The Argentine court summarily denied BSC's application for a restraining order preventing Carnero from commencing litigation in the United States, finding that the defamation claim lacked merit and acknowledging Carnero's absolute right to sue BSC

> before administrative and legal agencies that control the activities carried out by [BSC] . . . here[] or *in any other jurisdiction.*

Ackerman Dec. at ¶36 and Attachment 27 (emphasis added).

### F.     *Carnero's Lawsuits for Retaliatory Termination.*

On July 2, 2003, Carnero filed an administrative complaint before the Department of Labor pursuant to the whistleblower provision of the Sarbanes-Oxley Act, alleging that BSC retaliated against Carnero's reports of accounting fraud and other unethical behavior by terminating him from its Argentine subsidiary on April

3, 2003 and by attempting to intimidate and harass Carnero into dropping his charges of accounting fraud by commencing the frivolous Argentine defamation action. Attachment 11.

On or about August 7, 2003, Carnero commenced his related action in this Court asserting that BSC violated state law by terminating him in retaliation for his reports of accounting fraud and other unethical conduct (the "State Law Action"). Attachment 10.

Because the Department of Labor failed to issue a final decision within 180 days of the filing of Mr. Carnero's administrative complaint, Mr. Carnero commenced this lawsuit on January 7, 2004 for *de novo* review of his whistleblower claim under the Sarbanes-Oxley Act (the "Federal Whistleblower Action"). Attachment 31 (DOL final order).

BSC has moved to dismiss both the State Law Action and the Federal Whistleblower Action on procedural grounds.

## ARGUMENT

### I. THE WHISTLEBLOWER PROVISIONS OF SARBANES-OXLEY APPLY TO REPORTS OF CORPORATE WRONGDOING MADE BY PERSONS WORKING OUTSIDE OF THE UNITED STATES.

#### A. Foreign Reports of Corporate Wrongdoing Fall Within the Plain Meaning of the Statute.

The Whistleblower provision of the Sarbanes-Oxley Act prohibits any officer, employee, contractor, subcontractor or agent of a publicly traded company subject

to the Securities Exchange Act of 1934 from discriminating against an employee

because of, *inter alia*, reports of

> conduct which the employee reasonably believes constitutes
> a violation of . . . Federal law relating to fraud against
> shareholders, when the information . . . is provided to . . . a
> person with supervisory authority over the employee.

18 U.S.C. § 1514A(a)(1)(c).

With respect to enforcing this provision, the Act broadly provides that a

claim may be brought by any

> *person* who alleges discharge or other discrimination by
> any person in violation of [the Act].

*Id*. at   § 1514A(b)(1) (emphasis added).

It is undisputed that neither the Act's statutory language nor its legislative

history restricts the Act to reports of corporate wrongdoing made by persons

working within the territorial borders of the United States.  Nor does the statutory

language or the legislative history suggest that Congress intended to exclude from

the definition of "person" employees working outside of the United States.

        **B.**    **The *Foley* Presumption that Legislation
Regulating Labor Conditions Applies
Domestically Does Not Apply to Sarbanes-Oxley.**

BSC relies exclusively on *Foley v. Filardo*, 336 U.S. 281, 285 (1949) and its

progeny for the proposition that legislation of Congress is meant to apply within the

territorial borders of the United States unless a contrary intent appears.  *See* Sup.

Mem. at 4-11.  *Foley* and the other cases on which BSC relies involved legislation

regulating labor conditions in order to improve those conditions for workers and to protect them from potential abuses by their employers.

*Foley*, for example, involved the "Eight Hour Law," restricting the maximum number of working hours to eight hours per day for employees working in connection with a contract in which the United States is a party.  The Supreme Court reasoned that because Congress is primarily concerned with domestic *conditions existing in the United States*, it did not intend the Eight Hour Law to apply to working conditions in foreign countries.

In contrast, the purpose of Sarbanes-Oxley is to regulate the conduct of corporations, many of which are engaged in extensive multinational operations, in order to protect US capital markets.  In other words, the "conditions existing in the United States" that are the subject matter of the Sarbanes-Oxley Act are the US capital markets and investor confidence in those markets –  not the labor conditions that were the subject matter of the legislation involved in *Foley* and its progeny. Congress enacted the whistleblower provision to protect US capital markets by encouraging the disclosure of accounting fraud and other corporate wrongdoing.

In light of this fundamental difference in subject matter between Sarbanes-Oxley and the labor legislation at issue in *Foley* and its progeny, the Foley presumption has no application to Sarbanes-Oxley.  Indeed, there is no reason to presume that Congress intended to exclude reports of corporate wrongdoing from the scope of the Sarbanes-Oxley whistleblower provision –  such a presumption would be contrary to Congress' express purpose in enacting the legislation.

11

## C. Congress Has Clearly Expressed its Intent to Interpret the Whistleblower Provision Broadly to Further the Purposes of the Act.

Consistent with the plain meaning of the statutory language, the legislative history of the Act reflects a clear Congressional intent to interpret the whistleblower provision broadly to further the purposes of the Act.  On the day President Bush signed the legislation, the Department of Labor issued "an interpretation that incorrectly and narrowly interpreted" the whistleblower provision.  *See* 149 Cong. Rec. S1725-01 (Attachment 32) (statement of Sen. Leahy).[2]

The Senators who drafted the provision, Senator Leahy of Vermont and Senator Grassley from Iowa, objected until the Department of Labor withdrew its erroneous interpretation.  *Id*.  In reporting that "victory" over the Department of Labor's attempt to restrict the scope of the Act, Senator Leahy affirmed the broad Congressional purpose underlying the provision, stating that the

> law was intentionally written to sweep broadly, protecting any employee of a publicly traded company who took such reasonable action *to try to protect investors and the market.*

*Id*. (emphasis added).

BSC is mistaken in its assertion that this expression of Congressional intent is irrelevant.  Excluding from the Act's scope reports of corporate wrongdoing made

---

[2]Specifically, the Department stated that a corporate whistleblower's disclosure to a congressional committee would not be protected unless the whistleblower made the report to a committee already conducting an authorized investigation, even though that interpretation was at odds with the legislative intent and the express statutory language.  *Id*.

12

by persons working outside the United States would substantially weaken the express purpose of the Act.  Senator Leahy's explicit statement that the whistleblower provision was "intentionally written to sweep broadly . . . to protect investors and the market" is inconsistent with an intent to exclude such reports.

### D.    The Whistleblower Provision Does Not Conflict with Foreign Labor Laws.

BSC repeatedly asserts that application of the whistleblower provision to reports of corporate wrongdoing made by persons working abroad would conflict with foreign labor laws.  In fact, there is no such conflict.  The provision applies to corporations that are subject to the US securities laws and whose conduct has a direct affect on US capital markets and investor confidence in those markets.  By providing persons working abroad for such corporations with a remedy under US law for violations of US law, Congress has properly acted to encourage disclosure of information deemed essential to US interests.

Even where, as here, the applicable foreign labor law does not recognize a claim for retaliatory termination, the whistleblower provision of Sarbanes-Oxley does not conflict with local law, but merely provides an additional remedy under US law.  A true conflict would arise only if Congress attempted to regulate the corporate conduct of entities not properly subject to US jurisdiction, such as an attempt by Congress to regulate corporate conduct by companies that have no connection with the United States.  With respect to Sarbanes-Oxley, however,

Congress limited the legislation's scope to companies subject to the US securities laws.[3]

BSC's argument is essentially that Sarbanes-Oxley cannot apply to the foreign operations of US companies simply because foreign law might not provide similar remedies. Such an argument is akin to suggesting that the foreign operations of US companies that have a direct impact on US interests are also exempt from US securities laws, antitrust laws or other laws designed to regulate corporate conduct that has an impact on US interests.[4]

---

[3]BSC misconstrues the significance of the provision of the Age Discrimination Employment Act ("ADEA") that exempts an employer from compliance where doing so would "cause the employer . . . to violate the laws of the country in which [the] workplace is located." 29 U.S.C. § 623(f)(1) (see Sup. Mem. at 9). Like the labor laws at issue in *Foley* and its progeny, the sole purpose of the ADEA is to regulate labor conditions in order to protect workers. Accordingly, Congress was required to explicitly define the extent to which it intended the ADEA to apply to employees working abroad. Moreover, the ADEA significantly alters traditional notions of the employment relationship and may impose obligations on employers that actually conflict with obligations under local labor laws. In contrast, Sarbanes-Oxley is intended to protect US capital markets and merely prohibits retaliatory termination for reports of violations of US laws. While local labor laws may not provide a similar remedy for retaliatory termination, such local laws certainly would *not require* a company to terminate an employee for reporting corporate wrongdoing that might violate US laws. In the absence of such a local law, an employer would not be faced with violation of local law merely by complying with Sarbanes-Oxley. Since an actual conflict with local law is therefore highly unlikely, if not impossible, Congress certainly did not have to consider the possibility of such a conflict in drafting the statute.

[4]Neither US securities laws nor US antitrust laws explicitly provide for extraterritorial application. Nevertheless courts routinely apply those laws to extraterritorial activities that have a direct impact on US interests. The analysis should be no different for the whistleblower provision of Sarbanes-Oxley.

14

###### E.    The DOL's Preliminary Jurisdictional Finding
###### Is Wrong and Not Entitled to Any Deference.

BSC is mistaken that the DOL has made an agency determination regarding its jurisdiction that is entitled to deference under *Chevron v. NRDC*, 467 U.S. 837 (1984). Only agency determinations promulgated in the exercise of authority delegated by Congress to make rules carrying the force of law are entitled to such deference. *US v. Mead Corporation*, 533 U.S. 218, 226-227(2001) (restricting Chevron deference to such agency determinations so promulgated and finding that tariff classifications by the US Customs Service are not entitled to Chevron deference).

In this case, the DOL has not issued any final determination regarding the jurisdictional scope of the whistleblower provision of Sarbanes-Oxley.  The fact that the DOL regulations overlook the possibility of complaints filed by persons working abroad does not establish that the DOL made a considered determination of its jurisdiction over such complaints.  On the contrary, had the DOL made such a determination, its regulations probably would have so stated explicitly.  In addition, had the DOL made such a determination, there would have been no reason for it to wait almost six months before issuing its first written response to Carnero's administrative complaint.  Instead, when confronted with Carnero's administrative complaint, the DOL was apparently stumped by the jurisdictional issue and was unable to comply with its own deadlines for processing the complaint.

The DOL issued its preliminary decision on the eve of the expiration of the 180 day period in which it has jurisdiction to render a *final* decision.  Although that

preliminary decision concludes that the DOL lacks jurisdiction, the decision does not refer to any prior determination on that issue. On the contrary, the decision is based solely on the *Foley* presumption and the same flawed analysis advanced by BSC.

Finally, there can be no question that the DOL's preliminary decision is neither final nor entitled to any weight by this Court. The statute explicitly provides for *de novo* review by the district court where, as here, the DOL fails to issue a final decision within 180 days of the filing of the administrative complaint. 18 U.S.C. § 1514A(b)(1)(B). The DOL's preliminary findings clearly state that they are not final. *See* Attachment 30. The DOL subsequently acknowledged that the preliminary findings are not final and that Carnero's commencement of this lawsuit for de novo review divested the DOL of jurisdiction over this matter:

> In as much as Complainant has commenced an action in federal court, the Secretary no longer has jurisdiction over this matter. Jurisdiction now resides with the U.S. District Court for the District of Massachusetts.

Attachment 31.[5]

BSC's suggestion that this Court should issue a writ of mandamus directing the DOL to finalize its decision finds no support in the statute or case law. The

---

[5]BSC's statement that in a January 22, 2004 teleconference, the DOL Administrative Law Judge "indicated that the issue of whether the DOL has any further jurisdiction is an issue for the District Court to determine" is misleading. *See* Blickenstaff Aff. at ¶10. In fact, during that teleconference, the ALJ denied BSC's request to vacate his January 22, 2004 order finding that the DOL no longer had jurisdiction. In response to BSC's arguments that the DOL could assert "concurrent jurisdiction" with the district court and the district court had authority to remand the case to the DOL, the ALJ recognized that BSC was free to make any argument it chose to the district court. *See* Griffith Dec.

DOL administrative decision cited by BSC, *Stone v. Duke Energy Corp.*, explicitly holds that the DOL lacks jurisdiction over a case, like this one, where the complainant has commenced a lawsuit for *de novo* review in the district court. Attachment 33.[6]

## II.    BSC IS NOT ENTITLED TO SUMMARY JUDGMENT.

### A.    Carnero Has Alleged Discrimination That Occurred Within 90 Days of the Filing of His Administrative Complaint.

BSC is mistaken in its assertion that Carnero's whistleblower claim is barred by the Act's 90 day statute of limitations.  Carnero agrees that the statute requires that his claim be based on discriminatory acts that occurred on or after April 3, 2003 since Carnero filed his administrative complaint 90 days thereafter, on July 2, 2003. BSC is wrong that Carnero has not based his claim on such discriminatory acts.

First, BSC focuses only on whether the limitations period began to run prior to April 3, 2003 on Carnero's claim for retaliatory termination.  BSC ignores Carnero's claim that BSC's filing of its frivolous defamation lawsuit constitutes intimidation and harassment prohibited under the Act.  There is no question that (i) the Act prohibits such acts of discrimination, 18 U.S.C. § 1514A(a); and (ii) Carnero's first notice of BSC's defamation lawsuit was on June 30, 2003, well within the 90 day limitations period.

---

[6]Contrary to BSC's assertion, the district court in *Stone*, issued an order directing the DOL to stay its proceedings to allow the federal action to proceed.  *Id*. There is no authority for BSC's assertion that this Court can avoid or ignore its obligation of *de novo* review by issuing a writ of mandamus directing the DOL to finalize its determination.

Second, throughout the 90 day limitations period, BSC continued to assert that Carnero had been terminated by "his own fault and responsibility," even though the record clearly establishes that BSC terminated hims without cause. *See*, *e.g.*, Attachment 9. By taking that position, BSC effectively denied statutory termination benefits to which Carnero is entitled under Argentine law and shifted the burden of providing that his termination was "without cause" under Argentine law to Carnero. Such conduct also constitutes intimidation and harassment that falls within the 90 limitations period.

Finally, BSC is mistaken in its assertion that the statute began to run on Carnero's retaliatory discharge claim prior to April 3, 2003. Under *Delaware State College v. Ricks*, 449 U.S. 250 (1980) and the other authority on which BSC relies, the statute begins to run on a claim for discriminatory discharge when the decision to discharge is both made and *unequivocally* communicated to complainant. *See*, *e.g.*, *Zebedeo v. Martin E. Segal Co*, 582 F. Supp. 1394 (D. Conn. 1984).

Here, it is undisputed that BSC's telegrams dated March 25 and 26, 2003 offered Carnero reinstatement in a comparable position, albeit at a salary determined by reference to the Argentine peso rather than the US dollar. At the very least, that offer raised uncertainty as to BSC's intention to terminate Carnero. That uncertainty was not resolved until at least April 3, 2003, the date on which BSC sent its telegram explicitly terminating Carnero's employment contract with BSC's Argentine subsidiary.[7]

_____

[7]In fact, the limitations period did not begin to run until April 9, 2003, the date on which BSC rejected Carnero's April 5, 2003 telegram demanding

(continued...)

18

### B.    Carnero Has Stated a Claim.

BSC is mistaken in its assertion that Carnero has failed to state a claim because he has not plead with sufficient specificity "which statute BSC allegedly violated and how BSC allegedly acted unlawfully."  Sup. Mem. at 18.  The Act requires only that the complainant "reasonably believe" that the conduct constitutes a violation of US laws relating to fraud.  Carnero has clearly met this requirement by pleading that he believed the false invoices improperly inflated sales figures.  See, e.g., Attachment 10 (Compl.) at ¶ 17.  Accounting based on such inflated income figures is at the heart of the corporate accounting scandals that led to enactment of Sarbanes-Oxley.[8]

Similarly, BSC is also mistaken in its assertion that Carnero has failed to establish a causal connection between his reports of accounting fraud and his termination and BSC's other acts of discrimination.  First, Carnero has plead more than mere temporal proximity to establish causation.[9]

---

[7](...continued)
reinstatement at his prior salary level determined by reference to US dollar.  Prior to that time, it was not clear whether the parties dispute over salary level could be resolved.  At the very least, the timing of the parties' respective understanding as to whether Carnero was terminated or not presents a factual issue on which discovery should be taken prior to determination of a motion for summary judgment.

[8]While BSC asserts that the accounting irregularities that Carnero reported were *de minimus* and did not have a material impact on BSC's financial statements, such allegations are (i) irrelevant under the Act; and (ii) unsupported factual allegations that, at the very least, should be subject to discovery.

[9]For example, Carnero alleges that in response to his reports of false sales invoices in Argentina: (i) BSC transferred him to Brazil to a job that did not have direct responsibility for Argentina; (ii) his co-workers falsely accused him of

(continued...)

Second, the temporal proximity of less than three months between Carnero's

May 2003 meeting at which he insisted on an investigation and his August 8, 2003

termination is sufficient, even standing alone, to satisfy the causation requirement.

See, e.g., O'Neal v. Ferguson Construction, 237 F.3d 1248 (10th Cir. 2001)

(recognizing that a 2 month and 3 week period might be sufficient to establish a

causal connection and holding that the issue of causation was for the jury where,

as here, the jury could infer causation through other circumstantial evidence).[10]

### C.    Alternatively, BSC's Motion for Summary Judgment Should Be Stayed Pending Discovery.

Alternatively, the Court should stay BSC's motion for summary judgment

pursuant to Fed. R. Civ. P. 56(f) in order to permit Carnero to take discovery.  In

particular, Carnero is entitled to discovery regarding (i) BSC's intentions regarding

its offer to reinstate Carnero in March and April 2003; and (ii) the extent of the

---

[9](...continued)
unethical conduct; (iii) his direct supervisor, Ziemke, presented with a forged letter
that purported to implicate him in unethical conduct;(iii) McFaul terminated Carnero
on August 8, 2003 before Carnero received the results of the investigation that
Carnero had demanded by undertaken; (iv) BSC cut-off post-termination settlement
negotiations in response to Carnero's insistence on pressing his claims based on his
reports of accounting fraud; (v) BSC filed a frivolous lawsuit alleging that Carnero's
assertion of his claim for retaliatory discharge constituted defamation.  Certainly
these allegations give rise to a strong inference that BSC engaged in its
discriminatory conduct because of Carnero's insistence on pressing his complaints
of accounting fraud.

[10]BSC cites Clark Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) for the
uncontroversial proposition that temporal proximity must be "very close" in order to
establish the requisite causation element without additional evidence.  Sup. Mem.
at 19.  BSC's citation of Clark, however, fails to include O'Neal as the primary
authority for this proposition cited by Clark, even though BSC's citation includes
the secondary authority cited by Clark.  Id.

Latin American false sales problem reported by Carnero and the impact of that problem on BSC's financial statements.  *See* Griffith Dec.

### III.    THE LAWSUIT SHOULD NOT BE DISMISSED ON GROUNDS OF COMITY OR FORUM NON CONVENIENS.

Carnero hereby adopts his arguments advanced in opposition to BSC's motion to dismiss his State Law Action, including his memorandum of law in opposition to that motion.  Those arguments apply with even greater strength to Carnero's whistleblower claim under federal law.

**CONCLUSION**

The Court should deny BSC's motion to dismiss or, in the alternative, for summary judgment or to stay.

Dated:        Boston, Massachusetts
              March 17, 2004

                                LUSHAN, McCARTHY & GOONAN
                                Counsel for plaintiff Ruben Carnero


                                By: _____
                                     Michael Lushan
                                496 Harvard Street
                                Brookline, Massachusetts 02446
                                (617) 739-0700
                                (617) 734-5375 (fax)

Of Counsel:
BOLATTI & GRIFFITH
45 Broadway, Suite 2300
New York, New York 10006
(212) 363-3780
(212) 363-3790 (fax)